Good morning, your honors. May it please the court. Richard Garrigas for the appellant. We are basically here because a paid informant, a man who claimed to have information damning to not my client, but to another person, kept that information quiet for a couple of years until there was a reward of $20,000 posted for it, and then came forward claiming that one, this man named Strebent, Gerald Strebent, he claimed, and no one else has testified to this, no one else knows anything about it except him, that one Raphael Torrey told Mr. Strebent, the informant, that my client, Angelina Richards, had indicated that she wanted her husband killed and would pay for it. That is the only connection between my client and this verdict. That's the only evidence that my client did anything. That was allowed in by the district court because of federal rule of evidence 801D2E, the co-conspirator. The reason that was allowed in is because the court found that Mr. Strebent's testimony satisfied the rules to require, to allow a finding that Mr. Raphael Torrey was a co-conspirator with my client. Because Strebent said that Raphael Torrey said that my client said she wanted her husband dead, or gone, actually, were the words that Mr. Strebent used, wanted him gone. We feel, the appellant feels, that that does not satisfy the requirements of 801D2E. We feel there has to be some credibility. Without that, there couldn't have been a finding of co-conspirators. That had to be accepted lock, stock, and barrel by the court. Otherwise, it couldn't. The court could not have found that there was a co-conspiracy at all. But the court lists some 13 reasons why it thought that there was evidence of a conspiracy, not just the testimony from Mr. Strebent. That's right. And that is my next point. Yes, the court did list 13 things. All of those things had an explanation that was in the evidence that was there. Every one of them had evidence. None of them were a major example of what I'm talking about. There was a business that the court felt my client, Angelina Richards, and Raphael Torrey were starting a business. And my client gave Raphael Torrey $10,000 to start their business. And the court felt that that indicated that there was a conspiracy between the two. The problem with that is, from the same man, Mr. Strebent, the same man who said that there was a conspiracy, that there was an offer to make a killing, he also testified that the deceased was fully aware of this business. It wasn't a secret thing between Angelina Richards. The decedent was aware of it, but he was supplying material for it. The decedent was a friend of Mr. Torrey. The decedent was in a business that bought used medical equipment and refurbished it and sold it. One of the things in this business was a martial arts studio. Pads for the floors were expensive things that he needed for that. They were given to the killer, Raphael Torrey, by the decedent for his business. They were stored by Mr. Strebent, who helped bring them from Yucca Valley or someplace up there, to store them in the decedent's warehouse until they got the business going. But the court felt that the decedent didn't know anything about the business. The record is clear that Mr. Torrey was a friend. He was using the truck that belonged to the decedent. The decedent had let him have the truck, and he was using it as though it were his own. But, you know, there are these 13 circumstances. It's all circumstantial evidence that are relied upon by the court. The trial judge heard the witnesses. The circumstantial evidence may be subject to one or more inferences, some of which are innocent, some of which are not. Yes. But isn't that the job of a trial judge, to draw those inferences in a bench trial? Of course it is. So why wasn't it appropriate for the trial judge to do that here? Because I don't think the judge could make a decision here on those things. It is, I think, significant to note that this was a bench trial which ended in May, and the decision didn't come out until four months later. And what turned it, I believe, was the trial judge's decision to, and this is the next part of our appeal, the drawing of a negative inference because my client at one point in time took the Fifth Amendment during a deposition. And I think without that negative inference, the judge went to great lengths to spell out her justification for taking it. But even without that inference, wasn't there sufficient independent evidence, circumstantial evidence of her involvement in the conspiracy? I believe, Your Honor, if it had not been for the district courts feeling it necessary to draw the inference, I think it would have been a stalemate. I don't think there would have been a preponderance because every one of the 13 points that the judge did raise had an explaining factor that was in the evidence. Well, but this reminds me of my early days doing drunk driving cases. There were all of these things that independently could be explained that, well, I fell down because I have a bad knee, and I smelled of alcohol because I'd had one glass of beer, and I was driving badly because my car hadn't been serviced for a year. But when you put all of it together, the fact that not only that each of the circumstances is there but that they all exist at the same time, I mean, that seems to me Judge Snyder was looking at not only the individual circumstances but also the fact that they all coexisted. But they all coexisted involving all the people, including the decedents. He was part of it all, too. So the tipping point was the negative inference? Is that what you're saying? That is what I'm saying, was the negative inference. I think, forgive me, but I believe that the ultimate reason the decision came down the way it was was because of the moral aspects. I think it was a moral judgment. I mean, there were sexual dalliances involved in this case. There was a lot of conduct that is not fit. It was improper. But it wasn't just my clients. It was everybody in the circle of people that was involved in this. And I think the judge had a great sense of distaste for all the people that were involved in this case. The decision, I think the tipping point, you understand, and I think that was it, the tipping point was the decision to draw the negative inference. And the negative inference, I think, is crucial. It's just crucial. And I think there is no justification for that under the circumstances. The Fifth Amendment is a constitutional right. And the circuit does have the rule that there has to be, you can't draw more of a negative inference than is necessary to satisfy or to alleviate any prejudice. This was a civil case. I'm sorry? This was a civil case. Yes, Your Honor. Drawing a negative inference is permissible in a civil case. I beg your pardon? It makes it permissible because it was a civil case. Yes, it is permissible. So she thought it was appropriate in light of the prior assertions of the Fifth Amendment rights, both at the prior trial and at the deposition. Yes. But it has to be limited. The use of the inference, the negative inference, has to be limited to what is necessary to level the field again if there was any prejudice. If there was any prejudice to the, what were essentially the plaintiffs in that case, to Angelina Richards taking the Fifth Amendment, if there were, and I will argue just briefly that there certainly wasn't and couldn't have been, but if there were, then the only inference that could be drawn would be enough to level the field. And that was enough to tip the scale in this case. Now, the reason there was no prejudice at all is because there were five questions that were asked and five questions that were objected to and no answer was given because of the Fifth Amendment. Every one of those questions was essentially, did you kill your husband? That is something that this person, Angelina Richards, had told law enforcement officers before she talked to them, no, I didn't kill my husband, no, I had nothing to do with killing my husband. That was before Mr. Torrey got convicted. That's correct. So. And that is a bigger part. Go ahead. You're anticipating my question. Go ahead. I mean, doesn't that change the calculation? It adds to the problem my client had at the time because when my client took the Fifth, that was right after Mr. Torrey had this thunderstorm had struck that Torrey was arrested. He had been taken in. Yes, it definitely does change the dynamics of all of this because she was deposed right after he was arrested. This thing had been thought by her and her family that no one was ever going to find out who killed her husband because it had been years since he died. And then all of a sudden, out of the blue, this stuff happens, and it becomes clear to her that the San Bernardino County Sheriff has had an active, ongoing investigation of her for those years and still did for some of the six years. What I'm saying is why do the other parties in this case have to be satisfied with the statements that she made to the police before there ever was a trial and a conviction in the murder? I mean, why shouldn't they be able to depose her as circumstances have evolved? And why was it inappropriate for the district court to conclude that she shouldn't have been able to use the Fifth Amendment to shield her testimony? In other words, you're saying there's no prejudice because they had the early statements to law enforcement where she denied any wrongdoing, but things happened after that, and the circumstances changed. So how is it an abuse of discretion for the district court to conclude that there was prejudice? Because they did investigate all those things. Of the five questions that she took the Fifth Amendment to, there are only two possible answers to any of the five, yes or no. It doesn't take a mental giant to figure out what her answer would have been if she'd given one. It wouldn't have been yes. Now, they couldn't have been misled by anything. They knew what her answer was going to be, and they did investigate everything else. The deposition went on for two days. Those five questions were just a very, very small part of that deposition. They investigated everything. This bench trial, I forget how long it lasted. It was almost three weeks, I believe. They were not foreclosed from evidence. They had everything that her answering no wouldn't have changed a thing in what they did. It couldn't possibly have changed a thing, and it didn't prejudice them at all. Well, one of the questions was prior to Brian's murder, did you ever tell anybody that you and Raphael were going to move away together, which didn't seem to be the same sort of did-you-murder-your-husband question. Does that make a difference to your argument? That question, I think, was the – frankly, I'd forgotten that. Thank you for reminding me of it. That question was the only one that varied at all from the did-you-kill-your-husband, and the object of that was the same thing. And as to the subject matter of that question, they knew everything that happened. They knew where he was. They knew where these people had gone. And the – I don't think it changed theirs, the plaintiff's situation at all. The clear meaning of that question was, were you in cahoots with Raphael Torrey? She had testified and did repeatedly throughout this trial and before the trial during this deposition that she and – all the details about her relationship with Raphael Torrey, it had been what could – what should be described as at worst a dalliance until her husband died, and that her – she's an insecure woman. She didn't lie about anything that happened with – she did not lie about anything that happened with – between her and Raphael. She never lied to the police. She did things that I wouldn't want my daughter doing, but that's not the same as murder. All right. Thank you, counsel. We'll hear from opposing counsel now. Morning, Your Honor. May it please the Court, Richard Haskin appearing on behalf of appellee Keith Richards, guardian ad litem for Bryson Kendrell Richards. Your Honors, I'd like to take exception to the last statement that appellant's attorney said. Quite frankly, the court did find that appellant lied several times during the course of the trial, and Your Honors raised a good point earlier. The court did take in all of the evidence. The court did weigh the witness's testimony and lend credibility to that testimony, and the court found in its 13 enumerated findings of fact on page 27 to 28 that the appellant lied several times about several different things throughout the course of the commission of this conspiracy. It was those lies and other facts in conjunction with Strebent's testimony about what Torrey had told him that provided the court with the evidence to find against the appellant in this case. Some of those factors, and I won't go through all of them, but some of the factors that the court did find was that Angelina, excuse me, the appellant in this case was aware of the fact that Brian Richards, the deceased, had a million-dollar life insurance policy, and the court also found in footnote to that finding of fact that the appellant had lied about knowing about that insurance policy both to the police and at trial, that she did know about the million dollars and that her testimony wasn't credible. The court also found that her romantic relationship began with Rafael Torrey in August of 2001, that appellant and Torrey leased the commercial building together without Brian's knowledge or participation. And appellant's counsel today has argued that the deceased knew about this business relationship that was going on between appellant and Rafael Torrey. The deceased had no knowledge of that business relationship, and there's no cite to the record that says otherwise. At most, there was testimony from Gerald Strebent that the deceased helped Brian move some mats or helped Rafael Torrey move some mats into his business. But the testimony from the person who leased the commercial space to the appellant and Rafael Torrey, he said that they came in together almost as husband and wife to lease out this space, and he had assumed they were husband and wife the whole time. And there was no mention of the deceased. The deceased was never seen. And, in fact, the only two names on the commercial lease were Rafael Torrey and the appellant. And there's no explanation from appellant as to how the deceased somehow knew about this or approved of it. The court also finds that the marriage between the deceased and appellant was failing, and there's no disputed evidence otherwise. There's evidence that Rafael Torrey murdered Brian, aside from the obvious fact that he was convicted of that crime. There is substantial evidence presented at trial that Angelina, the appellant, and Rafael Torrey initially concealed their affair from the San Bernardino County Sheriff's Department by lying during their initial investigations. They made further misrepresentations to detectives as the investigation was ongoing. There's further evidence that the appellant, once she received a $50,000 advance on this life insurance policy, within five days had booked a romantic vacation to Cancun, and we're not talking three months away from the murder at this point. Photographs were introduced to that vacation that clearly showed that the two were having a romantic affair and were having a good time in Cancun, almost celebrating the murder. There's also evidence that the appellant lied to detectives during her subsequent interviews with the Sheriff's Department on December 11, 2003, after she had been contacted by Gerald Strebent on a pretextual telephone call. All of these facts, in conjunction with other facts, were joined with the statements from Gerald Strebent regarding Torrey's proposition to him, and that proved the existence of the conspiracy. And those facts were relied on, not simply appellant's counsel argues that, well, each one of those facts has an explanation. Well, yeah, true. And the appellant was able to provide those explanations during her three days of witnesses and testimony that she put on. And the court states in finding of fact number 62 that it considered all witnesses. It considered all evidence. And it weighed the credibility of those witnesses in that evidence, and it drew reasonable inferences, as it's permitted to do, in determining that the appellant was indeed liable. The appellant's counsel says it's pretty clear that Angelina Richards would have answered the question, did you kill your husband, or variations of that, with the answer no. That shouldn't surprise anyone. Help me understand how your client would have been unfairly prejudiced if Angelina Richards had taken the stand and said no to the question, did you murder your husband. Absolutely, Your Honor. When Angelina originally spoke to police immediately after the murder, her motive at that time was to complete the conspiracy. The end objective of the conspiracy was to obtain the life insurance proceeds. So at that time when she's initially talking to police, both her and Torrey, and evidence was introduced at trial about this, were trying to concoct a story to divert attention to others. And so Nationwide Life Insurance Company would pay the life insurance. So she spoke. Later on, years down the line, Gerald Strebent comes forward, a witness previously unknown to San Bernardino County Sheriff's Detective, previously unknown to us, came forward and led to the arrest, and ultimately conviction of Rafael Torrey. Prior to conviction, Angelina was deposed. Her attorney was present during that deposition, and arguably she consulted with her attorney about the Fifth Amendment and its effect in civil cases. She refused to answer questions, but there were seven questions, not five, but each question wasn't as simple as did you kill Brian Richards. And I'll give you an example. Your Honor already provided one, but I'll give you another. Did you express to Rafael Torrey a desire to, quote, get rid of Brian? Well, that question was based on Gerald Strebent's testimony that that's what Rafael Torrey had told him she said. The answer isn't so obvious as yes or no. If I had asked Angelina hypothetically during that deposition whether she had made such a statement to Torrey, her answer could have been, again, hypothetically, you know what, yes, I did say that. I was angry with my husband at the time, and I had expressed a desire, geez, I just wish he was gone. And that would have provided a myriad of follow-up questions that we wouldn't have had the ability, that we didn't have the ability to proceed with. Now, the answer, if it's no, provides us an opportunity to cross-examine her regarding Gerald Strebent's testimony.  That you indeed said this. What's your explanation? We were prevented from following those lines of questioning, and that's what the district court found in this case. And that's, in the record, the district court's reasoning, is that they prevented us from having that opportunity to fully cross-examine her on those issues. I'd also like to point out a statement that a panelist counsel made that's not quite accurate. He believes that the reason why we're here today and the reason why his client was found liable is simply because Strebent came forward to procure a $20,000 reward. There's no citation to the record, and there's absolutely no evidence that that is the case. And to the extent that appellant wishes to make that an issue, she certainly had the opportunity to do so in the underlying district court case. But the fact is that Gerald Strebent never knew about the $20,000 reward until after he told his story to police. Until after they had it set in their minds that they were going to go after Rafael Torre. And there's no evidence to suggest otherwise. With respect to the negative inference drawn from Angelina's invocation of the Fifth Amendment, I would remind the court that appellant's attorney was present at that deposition. And it's well known that the Fifth Amendment, if invoked in a civil case, a negative inference can be drawn against you. And appellant had to weigh that risk against the benefit, which at the time was trying to save herself from criminal prosecution. And in effect, appellant was using it as a shield during discovery. And then when she got to trial and it had gone that far and she wanted to get her life insurance money, now she tried to use it as a sword against the appellant. The district court had a couple of choices, though. The district court could have said, you can't testify about this subject because you didn't allow yourself to be deposed, which is something the district court did, or not. The district court could have said, and in addition to that I'm going to draw a negative inference from the fact that you invoked the Fifth Amendment or not. So in other words, there's a couple of different combinations that are possible. And I suppose the question is, did the district court have to go as far as it did to remediate the prejudice? Why did the trial judge have to both preclude testimony and draw the negative inference? Yes, Judge Fogle. In this case, I think the court actually fashioned a pretty fair remedy. What the court said was, you can testify. What you can't do is answer those very specific questions that were asked to you in deposition. You can answer any other question, and indeed Ms. Richards testified not once but twice in this case. And her testimony probably was a good two, two and a half hours in the case. She was also allowed to put on whatever evidence she wanted in the trial. And again, that lasted about three days. Appellant and appellee in the court also cited to Greystone Nash, which is the Third Circuit case, where they undergo this analysis. That case is far different. In that case, the district court's remedy was deemed too severe by the appellate court. And what they did in that case is they said, you can't put on any evidence whatsoever. That's not what happened here. What the court did is said, there's seven questions you can't answer, and that's fair because you didn't answer them during deposition. The court also, because it was a bench trial in this case, the court felt it appropriate to draw the negative inference because it could lend the proper amount of weight to that negative inference as it saw fit. And again, it was one of 13 factors. Now, appellant will argue that there's an explanation for the other 12. That was all handled by the district court, and those explanations certainly were considered. The final issue I'd like to address, and appellant's counsel did not address it, was the deposition testimony of Gerald Strebent, which was admitted by the district court and was raised as an issue in this appeal. I think it's clear from the record and clear from the findings of fact that Gerald Strebent did reside 100 miles outside the jurisdiction of that court. His deposition testimony, indeed, was that he resided in Oregon. Using those specific words, he provided appellant's attorney at the time with his Oregon address and his Oregon telephone number. That same telephone number and address was provided on appellee's witness list in the pretrial proceedings. And again, I, in fact, called Mr. Strebent several days before trial to see where he resided, and he was in Oregon when I called him. I don't quite see where the basis for appealing that decision is, but I will submit unless Your Honors have any other questions. All right. Thank you, counsel. Richards v. Richards is submitted, and we will take up DeSantis v. GMC.
judges: Wardlaw, Ikuta, Fogel